IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL A. FISHER                                                                                         PLAINTIFF

      V.                                   Civil No. 2:20-cv-02139-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                                                DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff, Michael Fisher, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

      **I.**    **Procedural Background**

      Plaintiff protectively filed his application for DIB on January 13, 2017, alleging disability since July 1, 2015, due to back pain, no upper body strength, emotional problems, anxiety, depression, and anger. (ECF No. 14-4, pp. 3-4, 20-21; ECF No. 14-6, pp. 2-8). An administrative hearing was held on July 30, 2019. (ECF No. 14-3, pp. 77-104). Plaintiff was present and represented by counsel.

      Born in 1970, Plaintiff possessed a high school education and technical training as an electrician. (ECF No. 14-2, p. 100). Although he did not continue to perform his past relevant

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

work ("PRW") as an electrician after his alleged onset date, he did work as a watchman and cleaner for a U-Haul yard. (*Id*. at 94; ECF No. 14-7, p. 4). This work, however, did not rise to the level of substantial gainful activity.

On October 23, 2019, the ALJ found Plaintiff's major joint dysfunction of the right hip, obesity, back disorder, hypertension, depression, and anxiety to be severe. (*Id*.). He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.). The ALJ found Plaintiff capable of performing sedentary work, requiring only occasional climbing, balancing, crawling, kneeling, stooping, and crouching and simple, routine, and repetitive tasks with occasional interaction with supervisors, co-workers, and the public and simple, direct, and concrete supervision. (*Id*. at 96). With the assistance of a vocational expert ("VE"), the ALJ determined Plaintiff could perform work as a document preparer, printed circuit board inspector, or copy examiner. (*Id*. at 101).

The Appeals Council denied review on June 25, 2020, and Plaintiff subsequently filed this action. (ECF No. 2; ECF No. 14-2, pp. 2-6). Both parties have filed appeal briefs (ECF Nos. 17, 20), and the matter is ready for Report and Recommendation.

## II.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the

record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience considering his residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

Plaintiff raises two issues on appeal: (1) whether substantial evidence supports the ALJ's RFC determination, and (2) whether the ALJ properly relied on the vocational expert's testimony to establish the availability of other work that exists in substantial numbers in the national economy.

#### A. RFC Determination

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because it fails to account for all his limitations. Residual functional capacity ("RFC") is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. A disability claimant has the burden of establishing his RFC. *Vossen*, 612 F. 3d at 1016.

The Eighth Circuit Court of Appeals has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). A claimant's RFC, however, is ultimately an administrative determination reserved to the Commissioner and based on all the relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Id*.; *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

#### 1. Physical RFC

Plaintiff asserts that the ALJ overstated his physical abilities, arguing he is not capable of performing the sitting, standing, walking, and reaching requirements of sedentary work. By its

definition, sedentary work primarily involves sitting, for up to six hours during an eight-hour workday, with periods of standing or walking totaling no more than two hours per workday. SSR 83-10. It also involves lifting no more than 10 pounds at a time and occasionally lifting or carrying files, ledgers, and small tools. 20 CFR § 404.1567(a).

After a thorough review of the record, the undersigned concludes that substantial evidence supports the ALJ's conclusion that the Plaintiff can perform sedentary work, requiring only occasional climbing, balancing, crawling, kneeling, stooping, crouching. The relevant evidence reveals the following:

- On March 20, 2017, during Plaintiff's initial psychiatric evaluation with Advanced Practice Registered Nurse ("APRN") Alice Slavens, at Western Arkansas Counseling and Guidance Center ("WACGC"), Plaintiff indicted that chopping wood helped to alleviate his depression. (ECF No. 14-8, p. 20). He also admitted to using marijuana regularly and a history of methamphetamine abuse in remission since September 2016.
- Two days later, he established care at the Booneville Mercy Clinic for complaints of pain and numbness in his right hip and leg, lower back pain, and pain between his shoulder blades. (ECF No. 14-8, pp. 6-8). Despite taking non-steroidal anti-inflammatory ("NSAIDs") drugs, his pain persisted. On exam, APRN Glenda King documented musculoskeletal tenderness with no edema or deformity. X-rays of Plaintiff's thoracic and lumbar spine showed dextrocurvature with moderate multilevel discogenic degeneration in the thoracic spine and thoracolumbar levocurvature with mild to moderate discogenic changes. (*Id*., pp. 10-11). Further, x-rays of his right hip suggested the existence of a cam deformity with femoral acetabular impingement. (*Id*., p. 12). APRN King diagnosed right hip pain, chronic bilateral lower back pain with right-sided sciatica, mid-back pain, and insomnia. She then prescribed Gabapentin, Voltaren XR, and Trazodone.
- The following month, Plaintiff reported that his elevated blood pressure made him feel "horrible." (ECF No. 14-8, pp. 8-10). Again, APRN King noted musculoskeletal tenderness and increased his Gabapentin dosage. She also prescribed Trazodone, provided a one-time prescription for Tramadol, and referred him to pain management.
- On June 29, Dr. Michael Westbrook's examination revealed a normal range of motion ("ROM") in Plaintiff's shoulders, elbows, wrists, hands, hips, knees, ankles, cervical spine, and lumbar spine; negative straight leg raise ("SLR") tests bilaterally; no muscle spasm, weakness or atrophy; a normal gait/coordination with the ability to walk on heels and toes, squat/arise from a squatting position, and stand/walk without an assistive device; and normal grip strength in both hands. (ECF No. 14-8, pp. 41-45). He diagnosed arthralgias and a possible history of untreated bipolar disorder and assessed mild limitations in the ability to walk, stand, sit, lift, carry, handle, finger, see, hear, or speak.
- On January 22, Plaintiff sought out treatment for pain in the bottom of his heel. (ECF No. 14-8, pp. 136-37). An exam revealed left shoulder pain, weakness, and tender points. Billy

- Noel, an APRN practicing at Noel Health and Wellness, prescribed Metoprolol, Mobic, and Prednisone.
- In February 2018, Plaintiff complained of arthritic pain, headaches, fatigue, and nausea. (ECF No. 14-8, pp. 56-58, 130-31). A physical exam was unremarkable and APRN Noel prescribed Metoprolol and Mobic.
- In mid-May, APRN Noel treated Plaintiff for complaints of right hip and knee pain. (ECF No. 14-8, pp. 59-60, 124-25). Although not very specific, he noted joint pain myalgia, weakness, tingling, and pain down the right leg on exam. APRN Noel then prescribed Mobic, ordered an MRI of his lumbar spine, and referred him to pain management. The MRI showed lumbar spondylosis with DDD and degenerative facet changes; a right paracentral focal disc protrusion at the L1-2 level with some mild mass effect on the thecal sac and mild central stenosis; posterior spurring and multilevel disc bulges with some mild central canal narrowing at the L3-4 level; right foraminal narrowing and lateral bulging of the disc at the L3-4 level with possible contact with the exiting L3 nerve root; and lateral bulging at the L2-3-level probably not contacting the exiting nerve root. (ECF No. 14-3, pp. 74-75).
- Between July and September, APRN Noel treated Plaintiff on approximately five occasions. (ECF No. 14-8, pp. 63-64, 116-121; ECF No. 14-9, pp. 35-36). Plaintiff reported pain levels between a 4 and 6 on a 10-point scale. For this, APRN Noel prescribed Norco and Meloxicam. Plaintiff consistently reported better pain relief and improvement in function.
- In October, Plaintiff contended that his pain with medication was a 6/10. (ECF No. 14-8, p. 94). However, he also indicated that his treatment enabled him to continue or to improve his ability to perform activities such as walking, working, and performing housework and admitted to overall improvement in his quality of life. Plaintiff denied side effects and aberrant or concerning behavior. APRN Noel made no changes to his treatment regimen. This continued unchanged in November. (ECF No. 14-8, pp. 92-94, 96, 112-113).
- On November 5, an exam revealed an antalgic gait with the use of a cane; tenderness in the cervical spine with a decreased ROM secondary to pain; tenderness, stiffness, and pain in the lumbar spine with a decreased ROM and radiculopathy down both legs; mid-low back pain exacerbated by side-bending/facet loading; reduced flexion and extension in both lower extremities; a decreased ROM in both hips; SI joint tenderness; and painful knees with weight bearing. (ECF No. 14-8, pp. 92-93). APRN Noel refilled Plaintiffs Norco prescription.
- The following month, Plaintiff's pain had improved to a 2/10 but he was stiff and had an altered gait. (ECF No. 14-8, p. 95). He continued to deny medication side effects, and Dr. Brian Whatcott at Pain Management of Fort Smith administered a trigger point injection into his lumbar spine.
- In January 2019, Plaintiff advised that although his back pain with radiculopathy had increased to a 7/10, the Meloxicam helped. APRN Noel diagnosed distress and lumbar back pain, refilled his medications, and referred him to the "back doctor." Later that month, Plaintiff returned with complaints of increasing pain, after being out of medication for two weeks. (ECF No. 14-8, p. 102). He again reported that his treatment was allowing him to continue to work or perform his other basic/necessary activities.
- On February 22, Plaintiff's pain had reduced to a 6/10. (ECF No. 14-8, p. 101; ECF No. 14-9, pp. 31-33). An exam revealed tenderness, muscle spasms, and a reduced ROM in

6

the lumbar spine; weakness and a reduced ROM in the arms; and crepitus and a reduced ROM in the legs. APRN Noel refilled his Norco.
- The following month, no changes were noted in his physical exam, but he did report increased pain. (ECF No. 14-8, p. 100, 140; ECF No. 14-9, p. 30). APRN Noel again refilled Plaintiff's Norco and prescribed Hydroxyzine, as he was also determined to be experiencing dizziness and imbalance as an allergic reaction to a medication.
- Ten days later, although he reported increased back pain, his pain rating decreased to 5/10. APRN Noel agreed to consider his request to increase his pain medication, refilled his Norco, and noted that he needed a back brace for lumbosacral support.
- Plaintiff saw APRN Noel on two occasions in April, rating his pain as a 9/10 and a 6/10. (ECF No. 14-8, pp. 97, 99, 103). On April 18, an exam revealed an antalgic gait with a cane; a positive SLR on the right; a reduced ROM in the lumbar spine with pain, muscle spasm, and tenderness; a reduced ROM in the cervical spine with pain, tenderness, and loss of the lordotic curve; and pain with a reduced ROM in the right leg. However, APRN Noel documented overall improvement and continued his medication.
- APRN Noel treated Plaintiff on two occasions in May 2019, continuing to note that his treatment enabled him to walk, work, exercise, and perform self-care tasks and documenting overall improvement in his quality of life. (ECF No. 14-8, pp. 89-91, 98; ECF No. 14-9, pp. 27-29). His physical exam remained essentially the same, but with the addition of impaired sensation in his right leg. No changes were made to Plaintiff's treatment regimen.
- In June, Plaintiff's pain ranged from a 5/10 to a 6/10. (ECF No. 14-8, pp. 86-88; ECF No. 14-9, pp. 24-26). Although he no longer had a positive SLR test, he did exhibit tenderness in his thoracic spine. Plaintiff's physical exams were otherwise unchanged, and APRN Noel simply refilled his Norco prescription.
- On July 1, Plaintiff established care with APRN Mary Lunsford at Access Medical Clinic. (ECF No. 14-3, pp. 64-69, ECF No. 14-8, pp. 72-81, 153; ECF No. 14-9, pp. 11-15). He reported a history of hypertension and noncompliance with his medication, indicating that he took only the Metoprolol. Plaintiff also indicated that he saw APRN Noel for chronic pain, but he wanted a doctor who would do more than just "throw pills" at him. Additionally, he complained of bilateral knee pain with clicking and popping on palpation, for which he wished to obtain a medical marijuana card. An exam revealed normal ambulation, muscle strength, tone, gait, and station. Further, his sensation and coordination were intact. APRN Lunsford diagnosed hypertension, chronic back pain, bipolar disorder, and osteoarthritis of the knee. After ordering x-rays of his knees and labs, she prescribed Cymbalta, Lamotrigine, and Prednisone. Those results revealed possible trace joint effusion and tiny patellar spurs on both knees and a slightly elevated sedentary rate. (ECF No. 14-9, p. 17).
- Seven days later, Plaintiff followed-up with APRN Noel. (ECF No. 14-8, pp. 83-85). Although he indicated that his pain, which he rated as a 6/10, interfered with his general activity and enjoyment of life, he also stated that his treatment regimen enabled him to walk, sleep, work, perform housework, perform self-care tasks, and exercise. He continued to report overall improvement in his quality of life. APRN Noel administered a trigger point injection into his lumbar spine and prescribed Norco.

- On July 15, 2019, Dr. Whatcott completed a medical marijuana application for the plaintiff, indicating that he suffered from intractable pain that had not responded to ordinary measures. (ECF No. 14-8, pp. 158-159).
- On July 31, Plaintiff experienced an allergic reaction to Lamotrigine, resulting in widespread itching. (ECF No. 14-3, pp. 60-63; ECF No. 14-9, pp. 8-10). He also complained of restless leg symptoms and requested a referral to a neurosurgeon. An exam revealed erythema on his lower extremities, a normal gait and station, intact sensation, and normal muscle strength and tone. APRN Anthony Ciaramitaro diagnosed chronic back pain, an allergic reaction, and restless legs. He advised him to discontinue the Lamotrigine and to take Zyrtec and Benadryl, prescribed Gabapentin, and referred him to a neurosurgeon.
- In August, APRN Ciaramitaro treated the Plaintiff on two occasions. (*Id*. at 53-59; ECF No. 14-8, pp. 5-7; ECF No. 14-9, pp. 2-5). He reported chronic fatigue and chronic back and right knee pain. Plaintiff felt that the fatigue was caused by his discontinuation of the Lamotrigine. His physical exam was unremarkable, aside from some crepitus in the right knee. APRN Ciaramitaro prescribed Pantoprazole; referred him to pain management, an orthopedist, and psychiatry; and ordered an MRI of his lumbar spine and an x-ray of his right knee. The x-ray was within normal limits. (ECF No. 14-3, p. 71).
- On September 10, Plaintiff visited APRN Noel with worsening lower back pain, which he rated as a 5/10. (ECF No. 14-9, pp. 21-23). He had a very unsteady gait; tenderness in his lumbar spine with muscle spasms, a reduced ROM, and weakness; and a reduced ROM in the legs. APRN Noel refilled his Norco.
- Eight days later, Dr. David Sudbrink treated Plaintiff for right hip and knee pain. (ECF No. 14-3, pp. 2-3). Plaintiff had a decreased ROM in his right hip with guarding, mild effusion and crepitus in the right knee, and an antalgic gait. An x-ray of his hips showed moderately severe narrowing of the cartilage space, hypertrophic osteoarthritis, and marked impingement. Noting that his hip pathology was the most prominent and that treatment of this issue would be the most successful, Dr. Sudbrink indicated that his treatment options were total hip replacement, cortisone injections, and activity modifications.
- On September 25, APRN Ciaramitaro again noted a normal physical exam, except for crepitus in the right knee. (ECF No. 14-3, pp. 49-52). He referred Plaintiff to neurosurgery.
- An October 2019 MRI of Plaintiff's lumbar spine showed multilevel disk/facet abnormalities with a broad-based right-sided disk protrusion at the L2-3 level that may have progressed slightly, producing compromise of the right lateral recess at this level; a small right paracentral disk protrusion at the L1-2 level which may have retracted slightly since the prior study; a broad disk bulging slightly eccentric to the right at the L3-4 level with a right subarticular rent in the annulus and mild right foraminal narrowing; and, a central disk bulging with mild narrowing of the left lateral recess related to some asymmetric disk bulge and left facet arthropathy. (ECF No. 14-3, pp. 72-73).
- APRN Ciaramitaro treated Plaintiff on two occasions in October. (ECF No. 14-2, pp. 86-88; ECF No. 14-3, pp. 47-48). On exam, he noted crepitus in the right knee without redness or swelling, a normal gait and station, intact sensation, good coordination, and pain in the elbows. Prednisone and Cyclobenzaprine were prescribed.
- The next month, Plaintiff conferred with neurosurgeon, Joseph Queeney, for complaints of lower back pain radiating down his right lower extremity. (ECF No. 14-2, pp. 69-79). An

    exam showed decreased patellar and Achilles reflexes bilaterally, intact sensation, decreased temperature in the right lower leg, and a positive Patrick's test on the right. Further, x-rays showed extensive arthritic changes in the entire lumbar spine and 14 degrees of scoliosis to the right at the L1-2 level. Additionally, Dr. Queeney noted that the MRI showed multilevel DDD, degenerative facet disease, and disk bulges, but no herniated disks or stenosis. He diagnosed chronic midline lower back pain without sciatica, DDD of the lumbar spine, scoliosis due to DDD, and right hip pain. Dr. Queeney recommended Plaintiff return to Dr. Sudbrink for treatment of his right hip. Because he did not have any objective evidence of nerve involvement or compression on exam, he recommended NSAIDs, physical therapy, injections, and chronic pain management medications.
- X-rays of Plaintiff's knees taken in November showed trace knee joint effusion with tiny patellar spurs. (ECF No. 14-3, p. 4).
- On January 13, 2020, an echocardiogram revealed mild mitral valve regurgitation with an ejection fraction rate of 61 percent. (ECF No. 14-2, pp. 61-65).

After reviewing this evidence, the undersigned is not swayed by Plaintiff's argument that he cannot perform the range of sedentary work identified by the ALJ. While the evidence does establish back, hip, and knee issues that would interfere with his ability to stand and walk for long periods of time, the evidence does not show that he is unable to stand/walk for two hours per eight-hour workday. In June 2017, Dr. Westbrook documented a completely normal exam and assessed only mild limitations in the ability to walk, stand, and sit. Moreover, two agency physicians reviewed the record in October 2017 and January 2018, and both concluded the Plaintiff could perform light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (ECF No. 14-4, pp. 26-27, 29-32). Additionally, Plaintiff remained able to perform work cleaning a U-Haul yard and consistently reported that his treatment regimen provided him with overall improvement in his quality of life. Utilizing these assessments along with the evidence regarding his occasional gait abnormalities and Plaintiff's reported ability to cook, clean, and chop firewood to relieve the stress, the ALJ limited Plaintiff to sedentary work with occasional postural activities. (ECF No. 14-8, pp. 46-49). The undersigned finds this to be substantially supported by the overall record.

9

As for his alleged sitting limitations, Plaintiff relies on the objective evidence, including MRIs, x-rays, and physical exams documenting tenderness and ROM deficits in his back. While it is true that the Plaintiff's impairments result in a degree of pain, the mere fact that working causes pain or discomfort does not require a finding of disability. *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (citing *Cruse v. Bowen*, 867 F.3d 1183, 1186 (8th Cir. 1989)). Further, a mere diagnosis alone does not imply disability; there must be a functional loss establishing an inability to engage in substantial gainful activity. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).

Here, the evidence fails to document any sitting restrictions assessed by Plaintiff's treating physicians or reported to the physicians by the Plaintiff. Although he shifted in his seat during the administrative hearing, he explained that this was due to nervousness rather than pain. Additionally, he advised Dr. Spray that he could watch television, perform all his self-care tasks, and attend church. He also worked as a watchman for a U-Haul yard.

Citing to only one medical record, Plaintiff also contends that the documented weakness and limited ROM in his upper extremities supported his testimony that he could no longer perform the overhead reaching required by his past work as an electrician, and that he had problems holding things. This isolated evidence, however, fails to document that any consistent limitations involving Plaintiff's upper extremities were assessed by his treating physicians. In fact, Dr. Westbrook noted completely normal grip strength in both hands and a full ROM in the cervical spine, shoulders, elbow, wrists, and hands. And, in 2017, Plaintiff advised his therapist that he chopped wood when he felt down. Accordingly, the undersigned finds that substantial evidence supports the ALJ's physical RFC determination.

### 2. Mental RFC

Additionally, the Plaintiff insists that the ALJ failed to properly assess his mental limitations, namely his anxiety, agitation, and inability to tolerate stress. While the evidence does indicate that the Plaintiff was diagnosed with bipolar disorder and anxiety, it does not show that these diagnoses were disabling.

- On February 6, 2017, Plaintiff was assessed at WACGC based on a referral by the Department of Human Services, after his children were taken into custody. (ECF No. 14-8, pp. 14-15). He admitted to a history of heavy alcohol use, methamphetamine abuse with his last use in September 2016, and regular marijuana use. Based on an adult chemical dependency/abuse assessment, Plaintiff was deemed to have a moderate to severe substance use disorder.
- Ten days later, he underwent his first diagnostic evaluation at WACGC. (ECF No. 14-8, pp. 16-19, 26-32). He endorsed symptoms including intermittent explosive disorder, panic disorder with agoraphobia, difficulty getting along with others, and some past homicidal ideations. On exam, Plaintiff exhibited a calm mood, appropriate affect, normal motor behavior, speech, thought processes, attention/concentration, memory, abstracting ability, insight, and judgment. APRN Slavens noted no signs of distress, disturbances in consciousness, or unusual perceptual experiences and found Plaintiff to be both alert and fully oriented. She diagnosed substance use disorder, bipolar I disorder, panic disorder, agoraphobia, and cannabis use disorder and recommended quarterly medication management, weekly psychotherapy, and weekly group therapy.
- The following month, during a psychiatric assessment with APRN Slavens, Plaintiff admitted to using marijuana weekly. (ECF No. 14-8, pp. 20-23). He also indicated that his mood had been "all right" over the previous two weeks, admitting that he tried to do something productive, like chop wood, when felt down. He reported continued discomfort in crowds.
- In June, a treatment plan review revealed overall improvement. However, Plaintiff failed to comply with DHS' requirements and lost his parental rights. (ECF No. 14-8, pp. 33-39). This resulted in significant anxiety and continued treatment was recommended.
- Plaintiff underwent a mental evaluation with Dr. Robert L. Spray, Jr. in July 2017. (ECF No. 14-8, pp. 46-49). Again, he reported suffering with anxiety, forgetfulness, restlessness, low energy, unprovoked anger, and excessive worry. On exam, he was alert, fully oriented, and cooperative. However, he was extremely anxious and requested that Dr. Spray leave the door open. Dr. Spray diagnosed generalized anxiety disorder ("GAD"), social anxiety disorder, adjustment disorder with depressed mood, unspecified bipolar disorder, cannabis use disorder, and a history of polysubstance abuse. He concluded Plaintiff would have mild to moderate difficulty with attention and concentration; difficulty, at times, with abstract verbal reasoning; difficulty completing tasks in a timely manner due to high levels of anxiety; and he could not manage funds without assistance.
- In October 2017, after reviewing all the evidence of record, Dr. Diane Kogut concluded Plaintiff would have moderate restrictions in his ability to sustain concentration or

11

- persistence, maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in work setting. (ECF No. 14-4, pp. 9-10, 13-15). This assessment was affirmed by Dr. Kevin Santulli in January 2018. (*Id.*, pp. 26-27, 31-32).
- On January 27, 2018, APRN Noel treated Plaintiff for complaints of anxiety, anger, and difficulty being in crowds. (ECF No. 14-8, pp. 56, 134-35). He diagnosed major depressive disorder and anxiety and prescribed Hydroxyzine and Celexa. However, the following month, Plaintiff reported that the Celexa made him sick to his stomach. (*Id.* at 132-33). APRN Noel noted that his speech was normal; his thought content logical and relevant; his judgment realistic; and his insight, memory, attention span, concentration, and fund of knowledge normal. (*Id.* at 57-58, 130-31). The Celexa was discontinued.
- In April, APRN Noel again noted Plaintiff's judgment and insight to be intact. (ECF No. 14-8, pp. 126-27). And, three months later, his exam remained unchanged, with a normal mood and affect. (*Id.* at 120-21).
- In September, APRN Noel treated Plaintiff for depression and arthritis. (ECF No. 14-8, pp. 116-19). On exam, he documented fatigue and depression, anxiety, and a social disorder and prescribed Buspar. APRN Noel noted that Plaintiff could not take Benzodiazepines due to his pain management contract.
- On October 2, 2018, Plaintiff denied any issues with depression, reporting that his current treatment was effective. (ECF No. 14-8, p. 94). However, the following day, he presented in the ER with reports of suicidal ideations ("SI"), aggressive behavior, agitation, and depression. (ECF No. 14-3, pp. 22-39). He had stopped the Buspar because it caused nausea and vomiting. An exam revealed him to be slow and withdrawn with a depressed mood, impulsivity, and suicidal ideations. Because he needed inpatient care, Plaintiff was transferred to the Levi Hospital Inpatient Facility, where he remained until October 8. (ECF No. 14-8, pp. 66-70). His discharge medications included Prozac, Carbamazepine, and Vistaril.
- In November, Plaintiff denied issues with depression. (ECF No. 14-8, pp. 92-93, 96, 112-13). And, in January 2019, APRN Noel noted normal speech; an appropriate mood and affect; normal thoughts without evidence of psychosis or SI; realistic judgment; and normal insight. (*Id.* at 110-11; ECF No. 14-9, pp. 34-35). His mental status exam remained unchanged in March, when APRN Noel advised him to discontinue the Prozac due to side effects, continue the Carbamazepine, and Hydroxyzine was prescribed. (ECF No. 14-8, p. 140).
- In May and June 2019, Plaintiff again denied issues with depression or thoughts of suicide. (ECF No. 14-9, pp. 24-29). He was alert and able to concentrate, and APRN Noel noted no change in Plaintiff's mental condition.
- On July 1, 2019, Plaintiff advised APRN Mary Lunsford that he was supposed to take Carbamazepine but could not tell whether the Carbamazepine was working. (ECF No. 14-3, pp. 64-69; ECF No. 14-8, pp. 72-81, 153; ECF No. 14-9, pp. 11-15). He did, however, admit that counseling had helped in the past and voiced a willingness to return to treatment. APRN Lunsford increased his Lamotrigine dosage and prescribed Cymbalta. One week later, APRN Noel noted that Plaintiff's mental status exam remained normal with no deficits in his ability to communicate or concentrate. (ECF No. 14-8, pp. 83-85).

- Later that month, Plaintiff presented to APRN Ciaramitaro with complaints that the increased dosage of Lamotrigine had caused widespread itching. (ECF No. 14-3, pp. 60-63; ECF No. 14-9, pp. 8-10). He advised Plaintiff to stop the Lamotrigine and to take Zyrtec and Benadryl.
- On August 5, he complained of fatigue, which he attributed to discontinuing the Lamotrigine but continuing the Cymbalta. (ECF No. 14-3, pp. 57-59; ECF No. 14-8, pp. 5-7). APRN Ciaramitaro found Plaintiff to be alert and fully oriented with a normal mood and affect and good judgment. He diagnosed bipolar disorder, directed him to continue the Cymbalta, and referred him to psychiatric services.
- In September, Plaintiff presented in the ER with complaints of agitation and anger. (ECF No. 14-3, pp. 40-45). On exam, he was noted to be agitated but not aggressive or combative. The doctor gave him one dose of Klonopin and advised him to see a psychiatrist for further treatment of his bipolar disorder.
- Three days later, Plaintiff again advised APRN Ciaramitaro that counseling had been helpful in the past and that he was willing to restart services. (ECF No. 14-3, pp. 49-52). He reported getting angry with his ex-wife and was very concerned that this could cause significant problems. An exam revealed anxiety and agitation with good judgment and insight. APRN Ciaramitaro prescribed Klonopin and referred him to Counseling Associates.
- APRN Ciaramitaro treated Plaintiff on two occasions in October 2019. (ECF No. 14-2, pp. 86-88; ECF No. 14-3, pp. 47-48). Plaintiff reported going to the counselor's office and completing the necessary paperwork, but he became highly agitated after waiting for one hour and left without being seen. (ECF No. 14-3, pp. 47-48). He was anxious and agitated but continued to exhibit good judgment and insight. APRN Ciaramitaro referred him to another psychiatrist and prescribed Seroquel.
- In November, Plaintiff reported tolerating the Seroquel well. (ECF No. 14-2, pp. 82-85). However, he indicated that the psychiatrist the nurse had referred him to was shutting down. Accordingly, APRN Ciaramitaro referred him to yet another mental health provider.
- On December 30, 2019, Plaintiff presented in the ER. (ECF No. 14-2, pp. 7-60). He was out of medical marijuana and reported anxiety and elevated blood pressure. Because his blood pressure was 207/135, Plaintiff was admitted for observation. After receiving Clonidine, Ativan, and Labetalol, his blood pressure responded well. His discharge diagnosis was hypertensive urgency, currently controlled, and he received a prescription for Norvasc.

The ALJ determined that Plaintiff had the mental RFC to perform unskilled jobs with only simple, routine, and repetitive tasks; occasional interaction with coworkers, supervisors, and the public; and simple, direct, and concrete supervision. After reviewing the record, we find substantial support for the ALJ's findings. Plaintiff initially sought out professional mental health treatment in 2017, when DHS required him to do so. It appears this was more in reference to the removal of his children from his ex-wife's home than for the treatment of his impairments.

13

Thereafter, he obtained his prescriptions from his primary care physician but did not seek out further professional mental health treatment. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that absence of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment). Moreover, he was hospitalized on only one occasion due to his mental health diagnoses. Despite his contention that he experiences a couple of panic attacks per month, this is simply not born out by the overall record. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). And, aside from one record indicating that he had to leave an appointment due to agitation and anxiety, aside from his own testimony, there is no evidence that this happened on multiple occasions or that he has had to modify his daily activities to accommodate his symptoms.

Plaintiff's mental status exams consistently revealed him to be alert and fully oriented with a normal mood and affect, intact judgment and insight, normal thought content, and normal concentration. Dr. Spray noted only mild to moderate difficulty with attention and concentration; difficulty, at times, with abstract verbal reasoning; and difficulty completing tasks in a timely manner in a job setting due to high levels of anxiety. Further, the agency physicians reviewing his file found only moderate restrictions in his ability to sustain concentration or persistence, maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in work setting. All these findings are consistent with the ALJ's RFC determination.

Additionally, despite his alleged disabling mental impairments, the Plaintiff reported the ability to carry on some work activity after his alleged onset date. He also occasionally socialized

and attended church and maintained a good relationship with his aunt and ex-wife. We believe this further substantiates the ALJ's mental RFC determination.

### 3. Subjective Complaints

Lastly, Plaintiff asserts that the ALJ failed to properly evaluate his subjective complaints. The ALJ is required to consider all the evidence relating to a Plaintiff's subject complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Id*. An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them. *Id*. However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted). The Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

In the present case, the ALJ considered Plaintiff's testimony that, in exchange for rent, he was able to work as a watchman and cleaner of a U-Haul yard across the street from his home. (ECF No. 14-3, p. 99). While this did not rise to the level of substantial gainful activity, it shows that the Plaintiff can perform some work despite his limitations. *See Toland v. Colvin*, 761 F.3d 931, 936 n.4 (8th Cir. 2014) (holding an ALJ may consider a claimant's work activity, even if such work was part time or below the earnings threshold of substantial gainful activity); *Polaski*, 739 F.2d at 1322 (noting work activity was a relevant factor).

15

Further, the Plaintiff also reported the ability to perform all his self-care activities; shop; cook; clean; exercise; watch television; occasionally attend church; socialize with a few friends, but infrequently due to anxiety; and maintain a good/normal relationship with his aunt and ex-wife (ECF No. 14-8, pp. 48, 83). *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (holding the ALJ properly considered the claimant's daily living pattern was inconsistent with disabling symptoms); *Polaski*, 739 F.2d at 1322 (noting daily activities were a relevant factor).

The ALJ also noted that Plaintiff took medication for his symptoms but reported no ongoing adverse side effects. Any side effects reported were promptly met with medication changes and/or adjustments. Further, treatment notes indicate Plaintiff had a history of both medication noncompliance and self-medicating with marijuana, prior to Dr. Whatcott's completion of the medical marijuana application. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). Further, Plaintiff consistently reported that the medications prescribed resulted in overall improvement in his quality of life, indicating that the medications were at least somewhat effective. *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). As previously stated, there is no requirement that the Plaintiff be symptom-free.

Accordingly, we find that the ALJ properly considered Plaintiff's subjective complaints.

### B. VE's Testimony

Rehashing his RFC argument, Plaintiff claims the ALJ obtained testimony from the VE in response to a hypothetical question that mirrored his RFC finding and then relied on that testimony to conclude that he was not disabled and could work as a document preparer, printed circuit board

16

inspector, or copy examiner. He contends the ALJ cannot utilize this testimony to deny him benefits because the hypothetical did not completely describe his limitations. However, a valid hypothetical need only include those restrictions the ALJ finds to be supported by the overall record. *See*, *e.g.*, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018); *Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014). Here, the ALJ included all the well-supported restrictions from his RFC finding in the hypothetical question posed to the vocational expert. (ECF No. 14-3, pp. 101-102). Therefore, Plaintiff's claim of error is without merit

### IV. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of December 2021.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE